# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00282 (TSC)** |
| **v.** | : | |
| | : | |
| **ELLIOT BISHAI,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Elliot Bishai ("Bishai") to 30 days' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution.

### I.     Introduction

The defendant, Elliot Bishai, drove his two friends and co-defendants, Elias Irizarry and Grayson Sherrill, from South Carolina to Washington, D.C. in order to participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

On April 25, 2022, Elliot Bishai pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. As explained herein,

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

a sentence of 30 days' imprisonment, with supervised release to follow, is appropriate in this case because: (1) before entering the building, Bishai filmed himself encouraging other rioters to "keep pushing" as they were ascending the Northwest stairs, yelled "go, come on, you got it" to rioters as they were scaling a wall of the building, and shouted, "let's go, civil war 2" in a separate video; (2) before entering the building, Bishai observed broken bicycle racks and fencing from the restricted perimeter, saw and smelled tear gas, and saw lines of police trying to block the crowd from progressing but continued towards the Capitol; (3) Bishai entered the building through a window at the Senate Wing door that had been shattered by other rioters; (4) Bishai entered and remained in a sensitive area on the first floor of the Capitol Building, namely a United States Senate conference room, Room S145; (5) as a member of the United States Civilian Air Patrol, a federally-supported public entity devoted to public safety, Bishai betrayed his duty to "keep the homeland safe." *See* https://www.gocivilairpatrol.com/about/civil-air-patrols-three-primary-missions (visited July 9, 2022).

The Court must also consider that the Bishai's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. As this Court stated, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25. Here, Bishai's participation in a riot that actually succeeded in halting the Congressional certification combined with Bishai's entry into a sensitive area and encouragement of other rioters renders a jail sentence both necessary and appropriate in this case.

2

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 71 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Bishai's conduct and behavior on January 6.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Figure 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd

already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Figure 1.  They flooded the area labeled "Lower West Plaza" Area C on Figure 1, pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.







*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

*Elliot Bishai's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Elliot Bishai drove himself, his girlfriend, and the two others who were to become his co-defendants in this case, Elias Irizarry and Grayson Sherrill, to Northern Virginia from South Carolina to attend the "Stop the Steal" rally. At the time, Bishai was a cadet in a Civil Air Patrol unit.[2]

After attending the former President's rally but before the end of his speech, Bishai, Irizarry, and Sherrill began walking towards the Capitol.  As they approached the west side of the building, they saw downed bicycle barricades and broken fencing from the restricted perimeter. Co-defendants Irizarry and Sherrill picked up what appear to be poles from the broken perimeter and carried them into the Capitol.  Later, Bishai admitted to FBI agents that he saw Irizarry and Sherrill carrying the poles but claimed he did not know where they came from.  He admitted that he saw and smelled tear gas and observed lines of police trying to block rioters from approaching and entering the building but chose to move forward anyway.  Bishai admitted that he knew the crowd was dangerous and advised his girlfriend not to go further.  His girlfriend did not enter the building.

---

[2] The Civil Air Patrol "is a congressionally chartered, federally supported non-profit corporation that serves as the official civilian auxiliary of the United States Air Force." https://www.google.com/search?q=civil+air+patrol. According to its website, the Civil Air Patrol:

> Civil Air Patrol is America's premier public service organization for carrying out emergency services and disaster relief missions nationwide. As the auxiliary of the U.S. Air Force, CAP's vigilant citizen volunteers are there to search for and find the lost, provide comfort in times of disaster, and work to keep the homeland safe.

https://www.gocivilairpatrol.com/about/civil-air-patrols-three-primary-missions (visited July 9, 2022).

Before entering, Bishai observed rioters scaling walls and climbing the scaffolding near the Northwest stairs. He documented this and other events in videos later seized from his phone. In these videos, Bishai can be heard yelling "keep pushing" at his fellow rioters as they ascended the Northwest stairs (Exhibit 1). He shouted, "Come on, you got it," (Exhibit 2) and "let's go" (Exhibit 3) to other rioters as they scaled the walls of the Capitol. He yelled to the rioters, "let's go, civil war two" (Exhibit 4).  A screenshot of Exhibit 2 is below.



Before entering the Capitol building, Bishai and Irizarry became separated from Sherrill. As shown in the photograph below, the U.S. Capitol was first breached at the Senate Wing Door by a rioter who jumped through a smashed-in window next to that door.



At approximately 2:26 p.m., only thirteen minutes after that initial breach, Bishai and Irizarry entered the building through that broken window. *See* Exhibits 5 and 6.



In the photograph above, Bishai is circled in red and Irizarry is circled in yellow.  Bishai stepped over shattered glass on the floor from the smashed-in window. Bishai is shown below from the outside of the building entering through the broken window:



*See also* Exhibit 11.  Upon entering through the broken window, Bishai and Irizarry turned right. Exhibit 5 shows that they were blocked from walking to the left – in the direction of the Senate floor – by a line of Capitol police officers.  After turning right and walking down the hall, Bishai and Irizarry entered Senate Room S145, a conference room off the Senate Wing door.  It is unknowledge how long Bishai and Irizarry remained in S145, but certainly long enough to sit comfortably in chairs in the conference room.  Bishai is circled in red and Irizarry in yellow:



Bishai filmed their entry into Room S145 on his phone. *See* Exhibit 7.

Bishai and Irizarry then headed to the Crypt, where they took photos and videos of one another:



*See* Exhibit 8.  Bishai is circled in red and Irizarry in yellow.

 After exiting the Crypt, Bishai and Irizarry made their way to the Rotunda where they met up with Sherrill.  Sherrill and Irizarry both carried metal poles with them throughout their time inside the Capitol building, as seen in the image below.  The poles appear to be broken bicycle racks that were used to create the restricted perimeter around the building.  Bishai admitted to seeing Sherrill and Irizarry carrying the poles but claimed he did not know where the poles had come from.   In the below image, Bishai is circled in red, Sherrill is on the left, and Irizarry is on the right.  Bishai appears to have removed his jacket and put on a red hat.  His backpack and checkered scarf match those in the above photograph showing Bishai in Room S145.



In the Rotunda, Bishai, Irizarry, and Sherrill took photographs and videos of one another while climbing on statues. In the below photograph, Bishai gives Sherrill the thumbs up sign. The photograph Bishai appears to be taking below was located on Bishai's phone:



*See* Exhibit 9.

In total, Bishai spent 27 minutes inside of the Capitol.  In addition to the signs of violence Bishai saw outside the Capitol, he also saw blood on the ground inside the Capitol, which he recorded on a video located on his phone.  *See* Exhibit 10.  On the ride home, Sherrill admitted to Bishai and Irizarry that he had hit a police officer in the head with a pole.  Sherrill's assault is documented on video from an open-source.  Despite Sherrill telling Bishai about the assault, Bishai did nothing with this information until his interview with the FBI on February 14, 2022.

*Elliot Bishai's Interview*

Bishai voluntarily agreed to an interview with the FBI on February 14, 2022.  During the interview, Bishai was mostly forthcoming.  Bishai admitted to traveling to Washington, D.C., and to entering the Capitol building.  He told the government that in the car on the way home, Sherrill told him and Irizarry about Sherrill hitting a police officer.  Bishai denied seeing this in person. He expressed remorse for his actions.

Bishai's phone contains over 80 images that reflect Nazi and white supremacist ideologies. Additionally, Bishai's phone contains over 400 videos made by the internet personality "GypsyCrusader."[3]  When confronted by the case agent about this, Bishai claimed that he did not believe he had downloaded 400 videos, and thought it was a much smaller number.  He also claimed that all of the Nazi and white supremacist content on his phone – including the GypsyCrusader videos – were there solely because he found them to be humorous, not because he actually agreed with their content.  Bishai added that he did not share this material publicly.

---

[3] According to Wikipedia, GypsyCrusader is the online alias for Paul Nicholas Miller, who livestreams frequently on various media sources.  He is an American far-right political commentator, streamer, white supremacist, and convicted felon. He espouses white supremacy and has been tied to multiple alt-right and far-right organizations, including the Proud Boys and the Boogaloo movement.  *See* https://en.wikipedia.org/wiki/GypsyCrusader.

*The Charges and Plea Agreement*

On March 15, 2021, Elliot Bishai and Elias Irizarry were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). (ECF No. 9). Sherrill had previously been charged via complaint on February 23, 2021. (ECF No. 1). On March 16, 2021, Bishai was arrested at his home in South Carolina. On December 15, 2021, Sherrill was charged via indictment with felonies, including 18 U.S.C. § 231(a)(3) and 18 U.S.C. §§ 111(a)(1). (ECF No. 57). Bishai and Irizarry were included on that indictment but their charges remained the same. *Id.* On April 25, 2022, Bishai pleaded guilty to Count Seven of the Indictment, charging him with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. (ECF Nos. 71 and 72). By plea agreement, Bishai agreed to pay $500 in restitution to the Department of the Treasury. *Id.* Irizarry and Sherill have maintained their pleas of not guilty.

## III.     Statutory Penalties

Bishai now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Bishai faces up to one year of imprisonment, supervised release of up to one year, and a fine of up to $100,000. Bishai must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. PSR at ¶¶ 38-45.  According to the PSR, the U.S. Probation Office calculated Bishai's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 38-45.

The Probation Office calculated Bishai's criminal history as a category I, which is not disputed. PSR at ¶ 48. Accordingly, the Probation Office calculated Bishai's Guidelines imprisonment range at 0-6 months. PSR at ¶ 81. Bishai's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at

18

108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the

Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro,
> comment 3. More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval
> of Guidelines sentencing, through oversight of the Guidelines revision process.
> See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to
> the Guidelines). Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case. Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one."

*Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve §

3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and

fairness moving forward.

## V.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Bishai's individual conduct, this Court should look to a number of critical mitigating and aggravating factors, to include: (1) whether, when, how the

defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Bishai personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Bishai is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.  Bishai's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Bishai drove almost 500 miles from South Carolina to Washington, D.C. to attend the "Stop the Steal" rally.  Before he even entered the Capitol building, Bishai saw signs of violence.  He saw broken bike barricades, tear gas, and the police attempting to keep the rioters out of the building.  His response to these things was not to retreat but rather to encourage the rioters' progression into the building.  He diligently recorded the efforts of the crowd to scale walls and to push their way up stairs that the police attempted to block in order to reach the building.  He appeared extremely excited and jubilant in all of the videos on his phone and on CCTV inside the Capitol.  He shouted words of encouragement to the rioters in their efforts to attack the building.  And most tellingly, he shouted, "Civil War 2."  These facts show Bishai's clear intent to rile up

21

the crowd and support civil disobedience and political violence.  Bishai also witnessed potential violence in his own co-defendants, both of whom carried large metal poles into the Capitol. He heard Sherrill's after-the-fact confession to hitting a police officer over the head with a pole yet did nothing.

Bishai entered the building through a shattered window, filming the chaos with his phone and appearing excited.  Once inside, he continued to document the event, running into the Crypt and taking more videos with his phone. Despite seeing what appeared to be blood on the ground, he continued to go deeper into the building.

Bishai also entered into a sensitive area of the building – a conference room on the Capitol building's first floor – where he filmed and appeared happy.

Although Bishai demonstrated remorse during his interview with the FBI, this remorse is late-coming and should be viewed in that light.  Additionally, he was not forthcoming about the volume of GypsyCrusader videos on his phone.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Bishai's History and Characteristics

As set forth in the PSR, Bishai does not have a criminal history.

Bishai was a cadet in a Civil Air Patrol unit – a civilian auxiliary of the United States Air Force – at the time of the attack on the Capitol.  Bishai had also enlisted in the United States Marine Corps at the time of the attack and was due to report for training when he was instructed by the Marine Corps not to do so as a result of his actions on January 6th.  While Bishai's service is laudable, it renders his conduct on January 6 all the more troubling. Bishai would have been aware of the safety threat posed by a mass of angry rioters in the building with members of Congress

inside.  In this case, Bishai's former service in the Civil Air Patrol, and his attempted service in the Marine Corps, make his conduct on January 6 all the more egregious and demonstrate a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.  As this Court has aptly pointed out, "[w]hat happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government." *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Bishai's brazenness, the excitement and joy he appeared to be experiencing at the riot, and the fact that he was with other rioters (his co-defendants) who had weapons, demonstrate the need for specific deterrence for this defendant. Bishai celebrated the violence of the day by filming videos on his cell phone and encouraging the other rioters to scale the walls, climb the stairs, and enter the building.  In his own words, Bishai was looking for "Civil War 2."

The government acknowledges that Bishai accepted responsibility relatively early by entering into this plea agreement. On the other hand, the Bishai's late-statement of remorse does not erase the jubilation he appeared to be experiencing as he witnessed signs of violence and destruction, and the threat to our democracy that took place on January 6th.  All of these factors underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United*

---

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Here, the Court is presented with a rioter-defendant who witnessed signs of violence outside the Capitol building, entered the building through a broken window, entered into a sensitive space within the Capitol, encouraged other rioters to get closer to the building, and expressed a desire for political violence by yelling, "Civil War 2." While no one factor is dispositive, comparable cases demand a sentence of incarceration.

Other judges of this court, and this Court, have sentenced Capitol breach defendants who spent time in sensitive places within the Capitol. A defendant's entry into a sensitive space places that defendant in a more serious category of offenders than defendants who remained in public hallways or rooms such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private space poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-

cr-38, ECF No. 3, at 2.  That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.  While Room S145 that Bishai entered was not a private office, it's clearly recognizable as a more private space than for instance the Rotunda, and thus implicates similar concerns.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), before this Court, the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol. This Court sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing.  Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6.  Mazzocco took photographs of himself smirking during the riot and posted them to social media. By contrast, Bishai did not post photographs to social media, but unlike Mazzocco, did nothing to mitigate the rioters' actions, and in fact encouraged them to scale walls and climb stairs that would lead to their entry into the building.

In the case of defendant Carson Lucard, Chief Judge Howell sentenced Lucard to 21 days' intermittent custody as a condition of 36 months' probation and 60 days of home detention where Lucard entered into Senator Merkley's office and remained there for four minutes.  *See United States v. Lucard* (21-CR-87 (BAH)).  Lucard had no criminal record, entered the Capitol twice, and aggressively chanted at police officers.  A slightly longer sentence of incarceration in the instant case is merited because Bishai actively encouraged other rioters to scale walls and push up the stairs.

In *United States v. Andrew Ericson*, Ericson went to the Speaker's Conference Room where he posed for a selfie, as well as for a photograph resting his feet on the conference table, took a beer from a mini-fridge, and posted his involvement to social media. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.   The government recommended 60 days' jail time, and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence.   You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it."   *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours."   *Id.*   The government has not uncovered any evidence that Bishai, unlike Ericson, engaged in destruction while in the conference room.   However, Bishai encouraged other rioters, unlike Ericson.   This suggests that a sentence of incarceration for Bishai that is comparable to the 20 days Ericson received would avoid unwarranted sentencing disparities.

The government acknowledges that defendant Felipe Marquez, who entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC).   Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment.   *Marquez,* Tr. 12/10/21 at 32, 34, 37.   Conversely, Bishai has no history of mental-health issues, and also encouraged other rioters.

One other defendant, Gary Edwards, who entered Senator Merkley's office, received a probationary sentence. Edwards was a 68-year-old retiree with no criminal record who was in the senator's office for less than one minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB). Unlike Edwards, Bishai aggressively encouraged other rioters to get closer to the building.

The Court should also compare Bishai's case to the case of another rioter who also encouraged other rioters during the attack. The case of defendant Joshua Wagner is comparable. *See United States v. Wagner*, 21-cr-310 (ABJ). Wagner repeatedly told other rioters to "hold their positions," and the "perimeter" and not to leave the Capitol grounds. Wagner was sentenced to 30 days' incarceration. Although Wagner also chanted things at the police, and refused orders by police to move, a sentence of 30 days for Bishai is appropriate because unlike Wagner, Bishai entered into a sensitive area of the building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Elliot Bishai to 30 days' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Grace Albinson*
GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-3276
Grace.E.Albinson@usdoj.gov

## **CERTIFICATE OF SERVICE**

On July 21, 2022, a copy of the foregoing was served on counsel of record for the

defendant via the Court's Electronic Filing System.

/s/ *Grace Albinson*
GRACE ALBINSON
Trial Attorney
Capitol Riot Detailee